FILED
2021 Jul-30  PM 01:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **CANDACE HARRIS,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:20-CV-00849-MHH** |
| | } | |
| **RENEAU, INC.,** | } | |
| | } | |
| **Defendant** | } | |

## MEMORANDUM OPINION

Plaintiff Candace Harris alleges that defendant Reneau, Inc. discriminated and retaliated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* and 42 U.S.C. §1981, as amended.  Ms. Harris has asked the Court to enter default judgment against Reneau.  (Doc. 18).  A court may enter a default judgment when a defendant, after receiving proper notice of the lawsuit against it, fails to appear and defend the claims against it.  For the reasons stated below, the Court will grant the motion for default judgment.

## DEFAULT JUDGMENT STANDARD

Rule 55 of the Federal Rules of Civil Procedure governs Ms. Harris's motion for default judgment. Rule 55 establishes a two-step procedure for obtaining a default judgment. First, when a defendant fails to plead or otherwise defend a

lawsuit, the clerk of court may enter a clerk's default.  FED. R. CIV. P. 55(a).  Second, after entry of the clerk's default, if the defendant is not a minor or an incompetent person, a district court may enter a default judgment against the defendant because of the defendant's failure to appear or defend.  FED. R. CIV. P. 55(b)(1)–(2).  "A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings."  FED. R. CIV. P. 54(c).

"A motion for default judgment is not granted as a matter of right."  *Pitts ex rel. Pitts v. Seneca Sports, Inc.*, 321 F. Supp. 2d 1353, 1356 (S.D. Ga. 2004) (internal footnote omitted).  After a clerk enters a default pursuant to Rule 55(a), a district court must review the sufficiency of the complaint and its substantive merits to determine whether a moving party is entitled to default judgment.  *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1370 n.41 (11th Cir. 1997).  A court must ensure that the well-pleaded allegations in the complaint state a substantive cause of action and that a sufficient basis exists in the pleadings for the relief sought.  *Cotton v. Mass. Mut. Life Ins. Co.*, 402 F.3d 1267, 1278 (11th Cir. 2005).  In addition to the pleadings, a court may consider evidence presented in the form of an affidavit or declaration.  *Frazier v. Absolute Collection Serv., Inc.*, 767 F. Supp. 2d 1354, 1362 (N.D. Ga. 2011).

A defaulting defendant "admits the plaintiff's well-pleaded allegations of fact" for purposes of liability.  *Buchanan v. Bowman*, 820 F.2d 359, 361 (11th Cir.

1987) (quoting *Nishimatsu Constr. Co., Ltd. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975) (internal quotation marks omitted)).  Because it has not defended the claims against it, Reneau has admitted the facts that Ms. Harris has alleged.

## FACTUAL ALLEGATIONS AND PROCEDURAL BACKGROUND

Reneau, Inc. owns and operates several Subway restaurants in Alabama. (Doc. 1, p. 2, ¶ 9).  Candance Harris, an African-American woman, was the assistant manager of Reneau's Subway location in Helena, Alabama.  (Doc. 1, p. 2, ¶¶ 7, 9–10).  In January of 2019, Ms. Harris was given the duties of store manager after the previous store manager, who was also an African-American woman, resigned.  (Doc. 1, pp. 2–3, ¶¶ 10, 12).  Ms. Harris did not immediately receive additional income or an official promotion after she took over the manager duties.  (Doc. 1, p. 3, ¶ 12). Scott Reneau, a co-owner of Reneau, Inc., promised Ms. Harris the store manager position and increased her pay $3.00 per hour to "reflect her new position, roles, and responsibilities," but he did not increase her pay to the typical manager salary of $12.00 per hour.  (Doc. 1, p. 3, ¶ 13; Doc. 22, p. 5).

Shortly after assuming the duties of store manager, Ms. Harris began to train a white female employee named Vicky to become the assistant manager.  (Doc. 1, p. 3 ¶ 14).  Ms. Harris trained Vicky every day for a month, and Ms. Harris expected Vicky to become the new assistant manager of the Helena Subway.  (Doc. 1, p. 3, ¶¶

14–15).  While she trained Vicky, Ms. Harris continued performing managerial duties, including preparing the weekly work assignment schedule for all of the restaurant's employees.  (Doc. 1, p. 3, ¶ 15).  In February of 2019, Ms. Harris's pay reverted to her assistant manager pay rate of $7.25 per hour.  (Doc. 1, p. 3, ¶ 16).  Ms. Harris asked Wendy Reneau, another co-owner of Reneau, whether she had done something wrong while she was acting as manager.  (Doc. 1, p. 3 ¶ 16).  Ms. Reneau told Ms. Harris that she made the decision to reduce Ms. Harris's pay because only Ms. Reneau had the authority to make employee pay decisions, and she had not authorized Mr. Reneau to change Ms. Harris's pay.  (Doc. 1, p. 3, ¶ 16).  Ms. Harris asked Ms. Reneau if other employees had their pay reduced and explained that she believed it would be discriminatory if only her pay had been decreased; Ms. Reneau did not respond.  (Doc. 1, p. 4, ¶ 17).  Ms. Harris was upset about her discussion with Ms. Reneau and the pay reduction, but she continued to work at the Subway location.  (Doc. 1, p. 4, ¶ 18).

When Ms. Harris arrived at work a few days later, Vicky was speaking with Ms. Reneau.  (Doc. 1, p. 4, ¶ 18).  Ms. Harris went to the back of the store to check the weekly schedule to make sure she had arrived for the proper shift, but the schedule she made no longer was on the wall.  (Doc. 1, p. 4, ¶ 18).  Ms. Harris asked Ms. Reneau about the schedule, and Ms. Reneau explained that she had removed Ms. Harris from the schedule and that Vicky would be assuming the position of store

manager.  (Doc. 1, p. 4, ¶ 19).  Ms. Reneau told Ms. Harris to go home and that she would call later.  (Doc. 1, p. 4, ¶ 19).  Ms. Harris asked if she had been removed from the schedule because she had opposed her pay being decreased; Ms. Reneau did not answer.  (Doc. 1, p. 4, ¶ 19).

For two weeks, Ms. Harris heard nothing from the Reneaus.  (Doc. 1, p. 5, ¶ 21).  Ms. Harris called Ms. Reneau several times, but her calls went straight to voicemail.  (Doc. 1, p. 5, ¶ 21).  When Ms. Harris went to Subway to pick up her paycheck, Vicky was working as the store manager.  (Doc. 1, p. 5, ¶ 21).  Vicky told Ms. Harris that she was shocked when Ms. Reneau approached her about being store manager, and Vicky asked Ms. Reneau, "what about [Ms. Harris]?" when offered the position.  (Doc. 1, p. 5, ¶ 21).  According to Vicky, Ms. Reneau responded that she "simply did not want a black person running her Helena store again" because it would be bad for the Subway business to have "two African-American managers running the store back to back" in a predominately white area.  (Doc. 1, p. 5, ¶ 21).  Because Ms. Harris did not have performance issues or disciplinary actions during her employment at the store, Ms. Harris believed she had been denied the promotion because of her race and terminated because she challenged Ms. Reneau's decision to reduce her pay.  (Doc. 1, p. 5, ¶ 20).

Ms. Harris tried to file for unemployment compensation after her discussion with Vicky, but Reneau blocked Ms. Harris's unemployment benefits.  (Doc. 1, p.

5, ¶ 23). Ms. Harris then filed an EEOC charge of discrimination. (Doc. 1, p. 5, ¶ 23; Doc. 26). The EEOC found "reason to believe that the violations ha[d] occurred" and attempted conciliation, but Reneau did not respond. (Doc. 1, p. 6, ¶ 23).

Ms. Harris filed this action on June 15, 2020, alleging that Reneau violated several provisions of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981 by failing promote her and retaliating against her for opposing her pay reduction. (Doc. 1, pp. 6–9, ¶¶ 24–46). On November 12, 2020, Reneau was served with a summons notifying the company of this case. (Doc. 14, p. 2). Reneau failed to appear and answer the complaint. Ms. Harris moved for entry of default against Reneau. (Doc. 18-1, pp. 3–4). The Clerk of the Court made an entry of default against Reneau on December 14, 2020. (Doc. 17, p. 1). Ms. Harris has now moved for default judgment against Reneau. (Doc. 18-1, pp. 3–4).

**ANALYSIS**

**A.**

Before a district court enters a default judgment, the court first must ensure that it has subject matter jurisdiction over the case. Ms. Harris contends that the Court has federal question jurisdiction under 28 U.S.C. § 1331. (Doc. 1, p. 1, ¶ 2). Pursuant to this statute, federal district courts have "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. In her complaint, Ms. Harris asserts that Reneau violated Title VII

of the Civil Rights Act of 1964 and 42 U.S.C. § 1981, two federal statutes.  Because Ms. Harris brings her claims under a federal statute, this Court has subject matter jurisdiction.

## B.

To enter a valid default judgment, a district court must consider whether it has personal jurisdiction over the defendant.  *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1217 (11th Cir. 2009).  A court's exercise of personal jurisdiction must comport with both the forum state's long-arm statute and the Due Process Clause of the Fourteenth Amendment of the United States Constitution.  *Olivier v. Merritt Dredging Co.*, 979 F.2d 827, 830 (11th Cir. 1992).  Alabama's long-arm statute permits courts to exercise jurisdiction to the limits of the United States Constitution.  *See* ALA. R. CIV. P. 4.2(a).

There are two types of personal jurisdiction, general and specific.  Ms. Harris does not allege that this Court has general jurisdiction over Reneau.  Rather, she alleges that this Court has specific jurisdiction over Reneau in this case.  (Doc. 1, p. 2, ¶ 9).  Due process permits a court to exercise specific jurisdiction over a defendant when "(1) the . . . defendant has purposefully established minimum contacts with the forum; and (2) the exercise of jurisdiction will not offend traditional notions of fair play and substantial justice;" and (3) the defendant's connections with the state give rise to the plaintiff's cause of action.  *S.E.C. v. Carrillo*, 115 F.3d 1540, 1542 (11th

Cir. 1997) (citation omitted).  Reneau purposely availed itself of the benefits of Alabama law and established minimum contacts with the State of Alabama when it opened and operated several Subway restaurants within Alabama.  (Doc. 1, p. 2, ¶ 9).  Because Ms. Harris's claims arise out of her employment with Reneau's Subway franchise in Helena, Alabama, (Doc. 1, p. 2, ¶ 9), and because this Court's exercise of jurisdiction over Reneau will not offend traditional notions of fair play and substantial justice, Ms. Harris has sufficiently alleged that this Court has personal jurisdiction over Reneau in this case.

## C.

Turning to the merits of Ms. Harris's claims, she brings claims pursuant to Title VII and 42 U.S.C. § 1981.[1]  Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2(a)(1).  42 U.S.C. § 1981 is similar to Title VII.  Section 1981 creates a federal right of action to challenge racial discrimination and guarantees to all citizens "the same right to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all

---

[1] Ms. Harris's Title VII and § 1981 claims are not alleged as separate counts in her complaint. In Count One, Ms. Harris alleges racial discrimination for failure to promote in violation of both Title VII and § 1981, and in Count Two, she alleges retaliation in violation of Title VII and § 1981. (Doc. 1).

laws and proceedings for the security of persons and property as is enjoyed by white citizens . . ." 42 U.S.C. § 1981(a). Ms. Harris asserts that Reneau did not promote her to store manager because of her race and that Reneau retaliated against her and terminated her because she complained about her pay reduction.

**Disparate Treatment Based on Race**

Ms. Harris has sufficiently alleged that Reneau discriminated against her due to her race. To state a race discrimination claim under Title VII, a plaintiff must "provide enough factual matter (taken as true) to suggest intentional race discrimination." *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1246 (11th Cir. 2015). A district court may enter a default judgment against a defendant on a racial discrimination claim when the plaintiff's well-pleaded factual allegations suggest that the plaintiff has suffered "an adverse employment action due to intentional racial discrimination." *Surtain*, 789 F.3d at 1246. For a disparate treatment claim under Title VII, a plaintiff must show that she suffered a materially adverse employment action, which is an action that "result[s] in 'a serious and material change in the terms, conditions, or privileges of [the plaintiff's] employment,'" and the employment action must be objectively viewed as materially adverse by a reasonable person in the circumstances. *Howard v. Walgreen Co.*, 605 F.3d 1239, 1245 (11th Cir. 2010) (quoting *Davis v. Town of Lake Park*, 245 F.3d 1232, 1238 (11th Cir.

2001), overruled on other grounds by *Burlington N. & Sante Fe Ry. Co. v. White*, 548 U.S. 53 2006)).

Ms. Harris suffered a materially adverse employment action when Reneau failed to promote her to the Helena manager position and reduced her pay shortly after Mr. Reneau gave her a $3.00 per hour raise. *See Weston-Brown v. Bank of Am. Corp.*, 167 Fed. Appx. 76, 80 (11th Cir. 2006) (*per curiam*) (internal citation and quotation omitted) (explaining that a failure to promote is a materially adverse employment action when "the position [plaintiff] desired had a greater wage or salary, a more distinguishable title, or significantly more responsibilities"). Ms. Harris asserts that the manager position had additional duties and responsibilities and a higher hourly wage than the assistant manager position. (Doc. 1, pp. 2–3, 6, ¶¶ 12, 15, 27). In addition to the failure to promote, Ms. Reneau's elimination of Ms. Harris's $3.00/hour raise is an adverse employment action. *See Herron-Williams v. Ala. State Uni*., 287 F. Supp. 3d 1299, 1311 (M.D. Ala. 2018) (holding that a seventeen-percent pay cut "is a quintessential adverse employment action"). These actions materially and negatively affected Ms. Harris's employment status, responsibilities, and pay.

Ms. Harris has alleged facts that causally connect her adverse employment actions to race discrimination. She asserts that Ms. Reneau selected Vicky, a white employee, for the manager position and that Ms. Reneau told Vicky that she did not

want an African-American as the store manager in Helena because she believed having a Black manager would be bad for business in the predominately white community.  (Doc. 1, p. 5, ¶ 21).  *See Van Voorhis v. Hillsborough Cty. Bd. of Cty. Comm'rs,* 512 F.3d 1296, 1300 (11th Cir. 2008) (quoting *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir. 1989) (holding that the "most blatant remarks, whose intent could be no other than to discriminate on the basis of [a protected characteristic], ... constitute direct evidence of discrimination" when the statements are made by decisionmakers or in the context of an employment action decision); *see also Chatmon v. Vision Hospitality, LLC*, Civil Action No. 2:10cv485–MHT, 2011 WL 3418228, *4 (M.D. Ala. July 11, 2011) (quoting *Damon v. Fleming Supermarkets of Fla., Inc*., 196 F.3d 1354, 1358–59 (11th Cir. 1999)).  Because Ms. Reneau's statement leaves no doubt about her intent to discriminate against Ms. Harris on the basis of her race, Ms. Harris has sufficiently stated a colorable claim for disparate treatment in violation of Title VII and 1981.  Accepting her allegations as true, Ms. Harris has established that she did not receive a promotion and had her pay reduced because of her race.[2]

---

[2] Ms. Harris could pursue her Title VII discrimination claim under a mixed motive theory by alleging that her race and other factors were the cause of her denied promotion and pay reduction. *See Quigg v. Thomas Cnty. School Dist*., 814 F.3d 1227, 1239 (11th Cir. 2016) (quoting *White v. Baxter Healthcare Corp*., 533 F.3d 381, 400 (6th Cir. 2008)) (holding that a plaintiff can prove a "mixed motive" discrimination claim if she shows that "(1) the defendant took an adverse employment action against the plaintiff; and (2) [a protected characteristic] was a motivating factor for the defendant's adverse employment action.").  But the Court is satisfied that Ms. Harris has sufficiently established that her race was the but-for cause of her materially adverse employment

**Retaliation and Retaliatory Discharge**

Ms. Harris contends that Ms. Reneau terminated her and blocked her access to unemployment benefits in retaliation for her complaint about her pay reduction. (Doc. 1, pp. 7–9, ¶¶ 34–46). The anti-relation provision of Title VII prohibits employers from:

> discriminat[ing] against any of his employees or applicants for employment . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). "To make a *prima facie* case for a claim of retaliation under Title VII [and § 1981], a plaintiff must first show (1) that '[]he engaged in statutorily protected activity,' (2) that '[]he suffered an adverse action,' and (3) 'that the adverse action was casually related to the protected activity.'" *Gogel v. Kia Motors Mfg. of Georgia, Inc.*, 967 F.3d 1121, 1134–35 (11th Cir. 2020) (citing *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018)); *Butler v. Ala. Dep't of Transp*., 536 F.3d 1209, 1213 (11th Cir. 2008) (quoting *Goldsmith v. Bagby Elevator Co., Inc*., 513 F.3d 1261, 1277 (11th Cir. 2008) (holding that to establish a claim of retaliation under section 1981, "a plaintiff must prove that he engaged in statutorily protected

---

actions, so she has proven both her Title VII claim and her § 1981 claim, and Ms. Harris's Title VII recovery is not limited by the restrictions that apply to mixed-motive cases. *See Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S.Ct. 1009, 1019 (2020) (holding that in a § 1981 discrimination case, a plaintiff must show that her race was the but-for cause of her injury).

activity, he suffered a materially adverse action, and there was some causal relation between the two events."). For a retaliation claim, a materially adverse action is one that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 861 (11th Cir. 2020) (quoting *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 57 (2006)). A plaintiff must establish "that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Uni. of Texas SW Med. Center v. Nassar*, 570 U.S. 338, 362 (2013). "In other words, 'a plaintiff must prove that had she not [engaged in the protected conduct], she would not have been fired.'" *Gogel*, 967 F.3d 1135 (quoting *Jefferson*, 891 F.3d at 924).

Ms. Harris has established her retaliation claim. Ms. Harris engaged in protected conduct when she opposed her pay reduction. A plaintiff pursuing her claim under the opposition clause of the anti-retaliation provision must allege that she had a "good faith, reasonable belief that the employer was engaged in unlawful employment practices" and that her "belief was objectively reasonable in light of the facts and record present." *Howard v. Walgreen Co.*, 605 F.3d 1239, 1244 (11th Cir. 2010) (quoting *Little v. United Tech., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997)) (internal quotations omitted). After Ms. Reneau reduced Ms. Harris's pay, Ms. Harris opposed the decision because she believed the reduction was based on her race. (Doc. 1, p. 7, ¶¶ 35–36). Ms. Harris's belief that Reneau

unlawfully reduced her pay because of her race was objectively reasonable based on the facts known to Ms. Harris at the time.  Ms. Harris had satisfactorily performed the managerial duties for several weeks and had not received disciplinary action. (Doc. 1, pp. 4–5, ¶ 20).  Additionally, before Ms. Harris took up the managerial duties, the previous manager, who is also an African American woman, resigned due to racial discrimination.  (Doc. 1, p. 2, ¶¶ 10–11).

Ms. Harris suffered a materially adverse action when Ms. Reneau decided to remove Ms. Harris from the schedule—effectively terminating her—and blocked Ms. Harris from receiving unemployment benefits.  (Doc. 1, pp. 4–6, ¶¶ 19–23). These adverse actions, which affected Ms. Harris's compensation and employment status, would dissuade a reasonable person from making a complaint regarding unlawful pay practices.  Ms. Harris has alleged that there was a causal connection between opposing her pay reduction and her removal from the schedule and eventual termination.  Ms. Harris asserts that she was removed from the schedule a couple of days after she complained about her pay.   A brief period of time between the plaintiff's protected activity and the employer's adverse action supports an inference of but-for causation.  *See Jefferson*, 891 F.3d at 925–26 (holding that an employee's termination within a few days of protected activity may be evidence of a causal relationship).   Therefore, Ms. Harris has established a claim for retaliation and retaliatory discharge in violation of Title VII and § 1981.

**D.**

Having found that Ms. Harris has established Reneau's liability under Title VII and § 1981, the Court turns to the issue of damages.  When evaluating a claim for damages, a court must "assure that there is a legitimate basis for any damage award it enters." *Anheuser Busch, Inc. v. Philpot*, 317 F.3d 1264, 1266 (11th Cir. 2007).  If the record is sufficient, a court may be able to determine damages without an evidentiary hearing. *See Sec. & Exch. Comm'n v. Smyth*, 420 F.3d 1225, 1232 n.13 (11th Cir. 2005).   Although a defaulted defendant admits well-pleaded allegations of liability, "allegations relating to the amount of damages are not admitted by virtue of default." *PNCEF, LLC v. Hendricks Bldg. Supply, LLC*, 740 F. Supp. 2d 1287, 1292 (S.D. Ala. 2010).  To avoid an award of damages and fees that is speculative or uncertain, a plaintiff must prove the amount of reasonable attorney's fees and damages to which she is entitled.  *See PNCEF*, 740 F. Supp. 2d at 1294; *see also Virgin Records America, Inc. v. Lacey*, 510 F. Supp. 2d 588, 594 (S. D. Ala. 2007) (noting that submitting affidavits and documentary evidence to show statutory damages may meet the plaintiff's burden of proving damages).

Ms. Harris requests $35,593.13 with interest in backpay, $50,000 in compensatory damages, and $5,076.73 in attorney's fees.  (Doc. 22, p. 4).  Ms. Harris also asks the Court to enjoin Reneau from continuing to violate federal employment law and from informing Ms. Harris's prospective employers that she was terminated.

(Doc. 22, p. 8).  To substantiate her damage assessments, Ms. Harris has submitted an affidavit, and her attorney has provided an affidavit.

### 1.  Back Pay

"Successful Title VII claimants . . . are presumptively entitled to back pay." *Lathem v. Dept. of Children and Youth Serv.,* 172 F.3d 786, 794 (11th Cir. 1999). "Back pay 'is the difference between the actual wages earned and the wages the individual would have earned in the position that, but for the discrimination, the individual would have attained.'" *Akouri v. Fla. Dep't of Transp.,* 408 F.3d 1338, 1343 (11th Cir. 2005) (quoting *Gunby v. Pa. Electric Co.,* 840 F.2d 1108, 1119–20 (3d Cir. 1988)).  Back pay serves Title VII's objective of making the plaintiff financially whole for the injury caused by the employer's discrimination.  *See Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418, 421 (1975) ("[B]ackpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination."); *see also Darnell v. City of Jasper, Ala.,* 730 F.2d 653, 655 (11th Cir. 1984).  A plaintiff must "mitigate [her] damages through reasonably diligent efforts to seek employment that is substantially equivalent," and back pay is available only for periods in which the plaintiff was "'available and willing to accept substantially equivalent employment' elsewhere."  *Lathem,* 172 F.3d at 794 (citation omitted).

16

Prejudgment interest generally is available for back pay awards.  *See Loffler v. Frank*, 486 U.S. 549, 557–58 (1988).  "Prejudgment interest accrues from the relevant period of discrimination at issue through the date of judgment."  *Krempasky v. Hendricks Restaurant Holdings LLC*, CIVIL ACTION NO. 1:18-CV-4279-MLB-LTW, 2019 WL 11790570, * 5 (N.D. Ga. June 7, 2019) (citing *George v. GTE Directories Corp.*, 114 F. Supp. 2d 1281, 1300 (M.D. Fla. 2000)).  In the Eleventh Circuit, district courts apply the IRS prime rate to determine the prejudgment interest in Title VII cases.  *EEOC v. Guardian Pools, Inc.*, 828 F.2d 1507 (11th Cir. 1987).

In her affidavit, Ms. Harris explained that she would have been paid $12 per hour if she had been given the manager position.  (Doc. 22-1, p. 1, ¶ 2).  Ms. Harris asserts that, if she had not been unlawfully terminated, she would have been paid that rate from February 1, 2019 to June 1, 2020, which is when she started her new job at a retail store.  (Doc. 22-1, p. 1, ¶¶ 2–3).  Ms. Harris provided the following chart that summarizes the calculation of the back pay to which she believes she is entitled:

| From | To | Back Pay | Accumulated Principal | Interest Rate % | Rate Factor | Interest | Total |
|---|---|---|---|---|---|---|---|
| 02/01/19 | 03/31/19 | 4160.00 | 4160.00 | 6 | 0.0150 | 62.40 | $4,222.40 |
| 04/01/19 | 06/30/19 | 6240.00 | 10462.40 | 6 | 0.0150 | 156.94 | $10,619.34 |
| 07/01/19 | 09/30/19 | 6240.00 | 16859.34 | 5 | 0.0125 | 210.74 | $17,070.08 |
| 10/01/19 | 12/31/19 | 6240.00 | 23310.08 | 5 | 0.0125 | 291.38 | $23,601.45 |
| 01/01/20 | 03/31/20 | 6240.00 | 29481.45 | 5 | 0.0125 | 373.02 | $30,214.47 |
| 04/01/20 | 06/30/20 | 4160.00 | 34374.47 | 5 | 0.0125 | 429.68 | $34,804.15 |
| 07/01/20 | 09/30/20 | 0.00 | 34804.15 | 3 | 0.0075 | 261.03 | $35,065.18 |
| 10/01/20 | 12/31/20 | 0.00 | 35065.18 | 3 | 0.0075 | 262.99 | $35,328.17 |
| 01/01/21 | 03/31/21 | 0.00 | 35328.17 | 3 | 0.0075 | 264.96 | **$35,593.13** |

Ms. Harris's calculation of her back pay is a reasonable estimate of the pay she would have received if Reneau had promoted her to manager and had not terminated her. Therefore, by separate order, the Court will award Ms. Harris $35,593.13 in back pay.

### 2. Compensatory Damages

A plaintiff can recover compensatory damages if the defendant "engaged in unlawful intentional discrimination." 42 U.S.C. § 1981a(a)(1). Compensatory damages include damages for "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses." 42 U.S.C. § 1981a(b)(3).[3]

---

[3] The amount of damages that a plaintiff may recover for violations of Title VII is subject to a statutory cap, depending on how many employees the defendant has. 42 U.S.C. § 1981a(b)(3). In her EEOC charge, Ms. Harris alleges that Reneau, Inc. has at least 15 employees. (Doc. 26-1, p.

In her affidavit, Ms. Harris described how her termination impacted her.  Ms. Harris explained that she had no income following her termination.  (Doc. 22-1, p. 1, ¶ 4).  Her car was repossessed, and she and her two children were evicted from their apartment.  (Doc. 22-1, p. 1, ¶ 4).  Ms. Harris was unable to eat some nights because she had enough food only to provide for her children.  (Doc. 22-1, pp. 1–2, ¶ 5).  Ms. Harris was distraught, and she was afraid that she would lose custody of her children.  (Doc. 22-1, pp. 1–2, ¶ 5).  Ms. Harris eventually had to file for bankruptcy.  (Doc. 22, p. 8).

Ms. Harris has suffered from significant financial difficulties because Reneau unlawfully terminated her and blocked her access to unemployment benefits. Therefore, the Court determines that Ms. Harris's request for $50,000 in compensatory damages is very reasonable and will award her that amount in the Court's final judgment.

### 3.  Attorney's Fees and Costs

Ms. Harris requests an award of $5,076.73 in attorney's fees and costs, which reflects 9.70 hours that her attorney, Sidney Jackson, completed at an hourly rate of $375.00 per hour.  (Doc. 22, pp. 8–9; Doc. 22-4).  Title VII permits district courts

---

4).  The Court assumes from this allegation that Reneau employs no more than one hundred employees, and therefore, Ms. Harris may only recover up to $50,000 in compensatory damages under Title VII.  42 U.S.C. § 1981a(b)(3)(A).  There is no such limit under § 1981.  42 U.S.C. § 1981a(a)(1).

discretion to award a reasonable attorney fee to the prevailing party.  42 U.S.C. § 2000e–4(k).  A reasonable fee is one that is "sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case." *Perdue v. Kenn A. ex rel. Winn*, 559 U.S. 542, 552 (2010).

Ms. Harris has supported her request for attorney's fees by submitting an affidavit from Mr. Jackson and copies of Mr. Jackson's timesheets.  (Doc. 22-2; Doc. 22-4).  Mr. Jackson's affidavit discusses his experience in handling Title VII, FLSA, FMLA, Sections 1981 and 1983, USERRA, ADA, and ADEA lawsuits.  (Doc. 22-2, p. 2, ¶ 4).  At $375.00, Mr. Jackson's hourly rate is consistent with the average hourly rate in Birmingham for similar employment law cases.  (Doc. 22-3, pp. 2–3, ¶ 6).  Considering his experience and the efficiency with which he was able to accomplish tasks in this case, the Court will permit an hourly fee of $375 for Mr. Jackson.  The time that Ms. Harris's attorney has invested in this case, approximately ten hours, is reasonable.  (Doc. 22-4, p. 2).  Mr. Jackson incurred expenses totaling $1,439.23, (Doc. 22-4, p. 4), and the Court finds that these expenses are reasonable except for the second service of process.  Mr. Jackson's timesheets indicate that his firm, Wiggins Childs Pantazis Fisher & Goldfarb LLC, paid $375.00 to attempt to have process served on Reneau, Inc. a second time after the Court determined that Ms. Harris's initial service of process was inadequate.  (Doc. 12).  Because that expense was incurred due to a fault of Ms. Harris's attorney, the Court subtracts that

amount from the fee award.  Accordingly, the Court will award Ms. Harris $4,701.73 in attorney's fees and expenses.

### 4.  Injunctive Relief

Ms. Harris requests an injunction requiring Reneau to explain to Ms. Harris's prospective employers that she voluntarily resigned, and she asks the Court to enjoin Reneau from continuing to violate federal employment law.  (Doc. 1, pp. 9–10). Because Ms. Harris would have a colorable claim that Reneau continued to retaliate against her in violation of employment law each time Reneau told a prospective employer that Ms. Harris was terminated, the Court will issue the injunction.

## VI.

For the reasons stated above, the Court will enter a default judgment against Reneau, Inc. and award Ms. Harris $85,593.13 for back pay and compensatory damages.  Additionally, the Court will award attorney fees of $4,701.73.  The Court will grant Ms. Harris's requests for injunctive relief.  The Court will enter a separate injunction and final judgment.

**DONE** and **ORDERED** this July 30, 2021.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE